# United States Court of Appeals
## For the First Circuit

No. 12-1612

FRANK WOODWARD,

Plaintiff, Appellant,

v.

EMULEX CORPORATION and JEFF HOOGENBOOM,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Howard, Stahl and Lipez,
Circuit Judges.

Paul H. Merry, with whom Law Offices of Paul H. Merry was on brief, for appellant.
T. Dos Urbanski, with whom Michael J. Mazurczak, Andre Sansoucy and Melick & Porter, LLP were on brief, for appellees.

April 18, 2013

**HOWARD, <u>Circuit Judge</u>**.  Plaintiff Frank Woodward appeals a grant of summary judgment by the United States District Court for the District of Massachusetts in his age discrimination suit against Emulex Corporation.  Woodward also appeals two discovery orders.  We affirm in all respects.

## I. Background

Emulex, a technology company based in California, manufactures components for large-scale computer networks and data storage systems.  Woodward joined Emulex in 2000 as a sales account manager.  Prior to joining Emulex, Woodward worked in sales for another technology company where he developed a close relationship with EMC Corporation, a large computer storage company based in Hopkinton, Massachusetts.  In his new position with Emulex, Woodward continued that relationship with marked success.  The company provided him with an office in Newton, Massachusetts, where he was the sole employee and could easily travel to his main client EMC.  His results speak for themselves:  over $800 million in revenue and over fifty "design wins," meaning that EMC incorporated Emulex parts into its own products, ensuring a steady stream of sales for the life cycle of those products.  Woodward and his team consistently outperformed their goals and Woodward received praise and accolades for his success.  The EMC team grew to five employees, two of whom Woodward managed as a senior director.

During this time, EMC was always either the third or fourth largest Emulex client based on sales revenue.

Beginning in 2007, however, revenues from EMC began to decline. Woodward interprets this decline as a function of two factors. First, the general downturn in the economy affected Emulex, as demonstrated by similarly sluggish numbers for other sales teams. Second, Woodward alleges that Emulex undermined the EMC team's ability to take advantage of growth opportunities. Though Woodward requested more personnel for his team, Emulex refused to increase the EMC sales force. Emulex also canceled certain products after the EMC team had already obtained sales agreements for them. Woodward also faults Emulex for failing to address inefficient and counterproductive actions by other Emulex employees. Part of Woodward's success was negotiating price agreements with terms favorable to Emulex. Other Emulex employees, seeing an opportunity to increase their own sales, offered EMC better rates. According to Woodward, these sales teams not only poached from his work, but also cannibalized Emulex's overall profits. His complaints about this practice went unanswered. Moreover, Emulex occasionally failed to deliver products on time to EMC, and it did not heed Woodward's suggestions about improving its delivery system.

In early 2009, Emulex let go two EMC team members. Shortly thereafter, in March 2009, Woodward was notified that he

too would lose his job.  The two remaining EMC team members jointly assumed Woodward's responsibilities when he left in July 2009.

While Emulex does not dispute these allegations, it contends that its decisions were the result of diminishing EMC-related profits, not the cause of them.  According to Emulex, the computer storage industry was undergoing a transition from stand-alone systems (storage systems) to integrated systems (server systems).  Consequently, Emulex, which produced Host Bus Adapters (HBAs) for both systems, began focusing on blade HBAs--removable hardware compatible with server systems--as opposed to storage-system HBAs.  EMC does not make or sell server systems.  Thus, Emulex claims, the EMC business could no longer justify a five-person sales team, as evidenced by the permanent reduction of the EMC team to two employees.

Woodward, however, discounted Emulex's reasoning and suspected that age discrimination played a role in his termination.  In January 2009--two months before Woodward's notice of termination--Jeffrey Hoogenboom, Emulex's new vice president of sales, commented that Woodward needed to "re-energize" the EMC team.  Woodward, who was fifty-five at the time, considered this a disparaging remark about the ages of the EMC team members, which ranged from forty-nine to fifty-nine.  After his termination, he filed a complaint with the Massachusetts Commission Against Discrimination (MCAD), alleging age discrimination.  MCAD dismissed

Woodward's complaint for a lack of probable cause, and he subsequently brought suit in state court, claiming, among other things, age discrimination under Massachusetts law. Emulex removed the case to the United States District Court for the District of Massachusetts based on diversity jurisdiction, and then moved for summary judgment on all counts. The district court granted this motion, and Woodward appealed.

## II. Discussion

A.      Discovery

Woodward first challenges two discovery-related orders: 1) the district court's partial denial of his third motion to compel; and 2) the district court's decision to quash deposition notices for three Emulex employees, including Hoogenboom. We review orders pertaining to discovery for abuse of discretion. See Awuah v. Coverall N. Am., Inc., 585 F.3d 479, 481 (1st Cir. 2009).

1.      Motion to Compel

From the outset of this case, discovery inched forward, with both sides contending over its scope and refusing to accede to the other's requests. During this acrimonious process, Emulex resisted Woodward's attempts to obtain considerable information about all employees at his management level or higher. Woodward eventually limited his request to information about the age, date of hire, positions and duties, date of termination, and grounds for termination of all employees holding the titles of director, senior

-5-

director, vice president, senior vice president or executive vice president between 2008 and 2010. Woodward requested this information in an interrogatory and in a document request filed in September 2011. He included a list of twenty-one known employees falling within these categories but did not limit his request to the employees on this list. Emulex did not provide the information, and Woodward moved to compel discovery. The district court granted the motion to compel an answer to the interrogatory, but only with respect to the twenty-one named employees. It did not order Emulex to comply with the document request. Emulex complied with the order. Woodward appeals the district court's decision to limit discovery to the interrogatory request, and to only the twenty-one named employees.

"[T]he standard of review in discovery matters is not appellant-friendly." Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 860 (1st Cir. 2008) (citations omitted) (internal quotation marks omitted). "[T]he trier must be accorded considerable latitude in gauging the extent of a party's compliance with [discovery] precepts." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 187 (1st Cir. 1989). Woodward claims that the district court's partial denial of his motion to compel constituted an abuse of discretion. We disagree. First, the denial of Woodward's document request was within the district court's discretion. Woodward sought the same information through the twin vehicles of an interrogatory and a

document request.  Thus, the district court did not deny discovery of new information, but simply did not compel the production of an arguably duplicative request for documents.

The district court was also within its power in limiting Woodward's interrogatory to the twenty-one named employees.  The purpose of this interrogatory was to compare Woodward's treatment to that of similarly situated employees.  A sine qua non of such a comparison is a congruence of work responsibilities.  See Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989) (employees must be similarly situated "in all relevant aspects" to establish disparate treatment in an employment discrimination suit (internal quotation marks omitted)), overruled on other grounds by Educadores Puertorriqueños en Acción v. Hernández, 367 F.3d 61 (1st Cir. 2004).  However, Woodward's request for information about all directors and vice presidents went far beyond Emulex's sales force and likely would have covered employees who had little or no comparative value for Woodward's suit.

By contrast, every employee on Woodward's list was a member of Emulex's sales force, working in the same area as Woodward.  Moreover, when Woodward filed this motion to compel, discovery had proceeded, albeit haltingly, for eleven months, giving Woodward time to identify the relevant employees for comparison.  The district court could have determined that, at this late stage in discovery, the twenty-one named employees represented

Woodward's best chance of finding some differential treatment between younger and older employees. Given the alternative--a fishing expedition into possibly barren waters--the district court did not abuse its discretion by limiting discovery to those individuals. See Fed. R. Civ. P. 26(b)(C)(ii) (requiring courts to limit discovery when "the burden or expense of the proposed discovery outweighs its likely benefit").

2. Motion to Quash

Woodward also appeals the district court's order quashing deposition notices for three Emulex employees: Hoogenboom, Jeff Benck, and Susan Bowman. At the discovery deadline, October 17, 2011, Woodward served the three employees with notices of depositions to occur in a three-day period two weeks hence. The parties struggled to find a time for these depositions that was convenient to both sides. Much of the difficulty arose from Woodward's insistence that he attend the depositions in person. Indeed, Woodward proposed a number of possible dates, and Emulex, relying on these dates, stated that its employees would be available for depositions over three days from December 12-14, dates that Woodward had indicated worked with his schedule. Woodward, however, did not confirm his availability for these dates, and he subsequently proposed new dates during the weeks of December 19 and December 26, 2011. Because the deadline for

dispositive motions was December 21, Emulex moved to quash the notices, and the district court granted the motion.

The court did not abuse its discretion in quashing the deposition notices. Woodward gave notice of the depositions at the last available moment, and then he proved to be the major barrier to their completion. When the defendants filed their motion to quash, the parties still had not fixed a date for the depositions, yet the deadline for dispositive motions was only five days away. Woodward's desire to attend the depositions in person is not compelling enough to overcome the burden that the defendants faced from his constant scheduling demands. We see no abuse of discretion in the district court's decision to quash these depositions. We now turn to Woodward's appeal of the grant of summary judgment.

B.        Summary Judgment

Our review of a grant of summary judgment is de novo, and we view the record in the light most favorable to the nonmoving party. See Henry v. United Bank, 686 F.3d 50, 54 (1st Cir. 2012). "Under [Federal Rule of Civil Procedure 56(a)], summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (internal

quotation marks omitted). After the moving party has presented evidence in support of its motion for summary judgment, "the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 158 (1st Cir. 1998). Although the district court granted summary judgment as to all of Woodward's claims, he appeals only the dismissal of his state law age discrimination claim.

Massachusetts has adopted the Supreme Court's approach to employment discrimination. See Sullivan v. Liberty Mut. Ins. Co., 825 N.E.2d 522, 530 (Mass. 2005). Under this framework, a plaintiff must first state a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1983). For an age discrimination claim in Massachusetts, this constitutes showing that: 1) the plaintiff was a member of the protected class, i.e. over forty years old, see Mass. Gen. Laws ch. 151B, § 1(8); 2) he had performed his job at an acceptable level; 3) he was terminated; and 4) he was replaced by someone five or more years younger. See Knight v. Avon Prods., Inc., 780 N.E.2d 1255, 1261-65 (Mass. 2003) (discussing the elements of an age discrimination case and concluding that "an age disparity of less than five years, by itself, is too insignificant to support a prima facie case of age discrimination"). The fourth prong, however, does not apply to a

reduction-of-workforce case such as this, where the employer does not replace the plaintiff with a new employee. In such cases, "some evidence that [the employee's] layoff occurred in circumstances that would raise a reasonable inference of unlawful discrimination" is necessary to establish the fourth prong. Liberty Mut. Ins. Co., 825 N.E.2d at 533-34.

Once the employee has stated his prima facie case, the employer must provide "some legitimate, non-discriminatory reason" for terminating the employee. McDonnell Douglas Corp., 411 U.S. at 802. The employer's obligation at this stage "is one of production as opposed to persuasion, as the burden of persuasion remains with [the employee]." Lewis v. City of Bos., 321 F.3d 207, 214 (1st Cir. 2003). If the employer satisfies this step, the burden shifts back to the plaintiff, who "must produce evidence sufficient to support a jury verdict that it was more likely than not that the articulated reason was pretext for actual discrimination." Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1309 (Mass. 1997) (citations omitted) (internal quotation marks omitted).

The district court assumed, "for sake of completeness," that Woodward stated a prima facie case of discrimination. Woodward v. Emulex Corp., 854 F. Supp. 2d 149, 158 (D. Mass. 2012). We follow this approach, bypassing the first stage of the analysis without deciding whether Woodward has in fact made his prima facie

-11-

case.  In response to Woodward's claim of discrimination, Emulex argues that it could no longer afford Woodward's position because of a market shift away from storage systems, as evidenced by the precipitous fall in EMC-related revenue.  Woodward offers three reasons why this explanation is pretextual:  1) the decline in EMC revenue was the result of Emulex's own irrational decisions; 2) employees whose performance was similar to Woodward's were not terminated; and 3) Hoogenboom's comments demonstrate discriminatory animus.  None of these is persuasive.

First, Woodward argues that Emulex permitted, even accelerated, the drop in EMC revenues.  Emulex discontinued products that Woodward had already sold and rejected Woodward's request for more sales personnel.  Woodward claims that these actions not only belie Emulex's claim that the market caused the drop in EMC's revenues, but are so contrary to Emulex's own interests that they amount to, in Woodward's terms, killing the goose that laid the golden egg.

Far from showing pretext, however, these decisions reinforce Emulex's proffered justification. Emulex, believing that the market was moving toward server systems, saw strategic value in diverting its limited resources away from the EMC sales team. These actions are consistent with that strategy. Woodward contends that Emulex's decisions unwisely assured the decline in EMC revenues.  He claims that EMC revenues were poised to rebound to

their earlier levels, and that Emulex ignored this possibility to its own detriment.  This critique of Emulex's business judgment has no purchase.  We are not concerned with whether the stated purpose "is unwise or unreasonable."  DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993); see also Webber v. Int'l Paper Co., 417 F.3d 229, 238 (1st Cir. 2005) ("[A]n employer is free to terminate an employee for any nondiscriminatory reason, even if its business judgment seems objectively unwise.").  Instead, Woodward must show that the stated purpose is untruthful.  See Liberty Mut. Ins. Co., 825 N.E.2d at 541 ("[O]ur task is not to evaluate the soundness of Liberty's decision making, but to ensure it does not mask discriminatory animus.").  Nothing in Emulex's actions casts doubt on the sincerity of its belief that the market had shifted from storage systems to server systems.[1]

Woodward's next evidence of pretext is that Emulex retained younger employees whose performance, like Woodward's, suffered in this period.  Disparate treatment between older and younger employees is a familiar means of establishing pretext.  See Smith Coll. v. Mass. Comm'n Against Discrimination, 380 N.E.2d 121,

---

[1] Woodward also cites two business practices--the failure to deliver products on time and internal "poaching" of Woodward's profits--that hurt his team's profitability.  To the extent that Emulex permitted these actions (Woodward provides no evidence that Emulex encouraged them), the negative effects would impact all sales teams, not just the EMC sales team.  Consequently, we cannot see how they show that Emulex's underlying motives were discriminatory.

125 (Mass. 1978) ("[A]lthough the fact of discriminatory motive must be proved, it can be inferred from differences in the treatment of two groups."). This requires, however, a showing that the employees are "similarly situated in all relevant aspects." Ocean Spray Cranberries, Inc., 686 N.E.2d at 1310 (citations omitted) (internal quotation marks omitted). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. . . . Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples." Dartmouth Review, 889 F.2d at 19.

As an initial matter, Emulex argues that the most relevant aspect of Woodward's employment was his membership on the EMC sales team. Though revenues were down across the company, Emulex maintains that the rapid disassembling of the EMC sales team was not merely a function of the economic downturn, but the result of a specific market shift that rendered the EMC team overly staffed. If we accept this proposition, then the only similarly situated employees would be other members of the EMC sales team.

Ultimately, we need not narrow the field of congeners to this degree, since even a broader approach does not suggest any similarly situated employees. Of the six employees whom Woodward mentions in his brief as similarly situated, two held positions senior to Woodward, and therefore were not similarly situated. The

-14-

remaining four employees were all forty years old or older at the time that Woodward was terminated--also members of the protected class. Moreover, while they all experienced similar percentage declines in revenues, that metric cannot alone determine the value of each employee, especially considering that their 2009 revenues ranged from roughly $30 million to almost $380 million.[2] Additionally, Woodward's focus on 2009 figures ignores Emulex's claim that EMC declines began in 2007, which is supported by the record. Finally, Woodward occupied a unique position within Emulex, as the only employee working from a remote office in Massachusetts. This arrangement likely entailed specific administrative costs. Given this context, the fact that other employees experienced declines in revenue similar to Woodward's falls far short of the showing necessary to establish that they were similarly situated to him for purposes of the pretext inquiry.[3]

Moreover, a macroscopic view of Emulex's personnel decisions reveals no pattern of age discrimination. As the

---

[2] Woodward achieved approximately $65 million in revenues in 2009.

[3] Woodward claims that the district court hampered his ability to produce evidence of similarly situated employees through its limits on discovery. See supra Part A.1. As we noted, however, the district court's order curtailing discovery appears to have targeted duplicative and immaterial requests. Thus we disagree that indulging his entire discovery request would have provided additional useful comparative evidence.

-15-

district court noted, Emulex retained five senior directors--the same management level as Woodward--who were older than he was. Moreover, the median age at Emulex as of March 2009 was forty-five. Woodward simply cannot show that Emulex's rationale was pretextual by comparing himself to other Emulex employees.

Woodward's third argument is that Hoogenboom's comment about the need to re-energize the EMC sales team constitutes direct evidence of discriminatory animus. Woodward asks us to interpret Hoogenboom's words as a critique of the age of the EMC team. Given the context of Hoogenboom's comment, however, such a reading is too strained. It is far more likely that the comment referred to the performance of the EMC team. Hoogenboom made the comment in January 2009; by March 2009 Emulex had decided to cut the team from five employees to two. Hoogenboom was not discussing a plan to reformulate the team with peppy, youthful salespersons. He was presaging its possible performance-related demise. While we will interpret any ambiguities in favor of the nonmoving party on summary judgment, we will not ignore the obvious context of a statement simply because the language is open to multiple interpretations.

Even if we did accept Woodward's reading of Hoogenboom's comments, it would not suffice to show discriminatory animus. Massachusetts courts have held that isolated comments, even those less ambiguous than Hoogenboom's, will not carry the plaintiff's

burden of persuasion if the employer has articulated a legitimate rationale for the termination.  See Liberty Mut. Ins. Co., 825 N.E.2d at 536 n.24 (finding that employer's comments that "[y]ou are part of the old guard[,] [y]ou have never adapted to the new system at Liberty Mutual," and [y]ou simply do not fit in around here anymore" did not constitute direct evidence that the layoff was motivated by unlawful age discrimination); Lee v. President & Fellows of Harvard Coll., 806 N.E.2d 463, 467 (Mass. App. Ct. 2004) (concluding that the comment "younger is cheaper" did not "create a genuine issue of material fact with respect to pretext"). Similarly, Hoogenboom's comment is not sufficient to show that Emulex discriminated against Woodward.

### III. Conclusion

For the foregoing reasons we **affirm** the district court on all issues.